IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DOMINION RETAIL, INC. ) | Civ. Action No. 11-cv-0233 |
| ) | |
| Plaintiff, ) | Judge Cathy Bissoon/ |
| ) | Magistrate Judge Cynthia Reed Eddy |
| v. ) | |
| ) | |
| TIM ROGERS, TIM TERRELL, GARY ) | |
| SHAPIRO, AND TIM BELL, ) | |
| ) | |
| Defendants. ) | |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

Here, the Court considers Plaintiff's Motion to Dismiss one of four counterclaims made by Defendants[1] in a suit where both Plaintiff and Defendants allege breach of an August 2008 Stock Purchase Agreement ("SPA" or "Agreement") [ECF No. 1-2]. This Agreement governed the Defendants' sale to the Plaintiff of stock in Cirro Energy ("Cirro"), a Texas company in the retail electricity market, formed by Defendants in 2002. The counterclaim under consideration (Count III) focuses on the valuation of Cirro's working capital at the time of the sale. Plaintiff contends that pursuant to a final and binding statement prepared by an independent accounting firm retained by the parties in accordance with the SPA's resolution provision, Defendants owe Plaintiffs additional funds.[2] Defendants challenge this assertion, arguing that they owe nothing more, and are themselves entitled to recover damages because of irregularities in and underlying the accountant's statement. Relying on the

---

[1] Throughout this Report and Recommendation, the Court refers to the parties as "Plaintiff and Defendants rather than using what it views as the more confusing, albeit more accurate, terms "Counterclaim Plaintiff" and "Counterclaim Defendants."

[2] This contract is not subject to the terms of the Federal Arbitration Act, 9 U.S.C. §1 et seq., since it does not involve a maritime transaction or interstate commerce. Id. at § 2.

"final and binding" language applicable to the accountant's findings in accordance with the terms of the SPA, Plaintiff argues that the accountant's calculation of working capital at the time of the sale is entitled to deference and should not be disturbed. Dominion thus asks the Court to dismiss Counterclaim III pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a cause of action. The Court agrees, and recommends that Plaintiff's Motion to Dismiss Counterclaim III [ECF No. 38] be granted.

## II. REPORT

### A. Facts

Because the issue raised in the third counterclaim is narrow, and the Court writes only for the parties, it does not set out a detailed statement of the facts underlying the contract dispute. Instead, the Court focuses on the facts critical to resolution of the narrow issue before it.

In its Complaint, Plaintiff, Dominion Retail, Inc. ("Plaintiff or "Dominion"), contends that it is entitled to recover funds from the four individual Defendants pursuant to the terms of an August 2008 SPA which governed Dominion's purchase of Defendants' stock in Cirro. According to Plaintiff, Defendants have outstanding financial obligations to Dominion which are rooted in three post-purchase events. The first took place in April 2009 when the United States Internal Revenue Service conducted an audit showing that Cirro's 2007 corporate net income exceeded the amount reported. [ECF No. 26 at ¶ 16]. The underpayment of state taxes was also an issue. [Id. at ¶2]. Finally, Dominion contends that irregularities in the calculation of Cirro's working capital as of the date of sale entitle Dominion to additional payment.

This Report and Recommendation addresses a single question: "[W]hether the Defendants have the legal [authority] to challenge [via a counterclaim] the working capital calculations of the Independent Accountants," given that the SPA provided that the accountant's determination would

"be *final and binding on the parties* and . . . adjusted if and as required by such determination." [ECF 39 at 5] (emphasis in original).

### B. Standard of Review

Most of the discussion of Bell Atl. Co. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009) appearing in cases decided by the United States Court of Appeals for the Third Circuit has been in the context of evaluating the sufficiency of a complaint. See e.g., Phillips v. Cty of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). The Court of Appeals applies the same standard when evaluating the sufficiency of a counterclaim. See Barefoot Architect, Inc. v. Bunge, 632 F.3d 822 (3d Cir. 2011) (vacating trial court's dismissal of three counterclaims). In deciding a motion to dismiss a counterclaim pursuant to Fed. R. Civ. P. 12(b)(6), the Court, as it would with a complaint, must accept as true all well-pleaded factual allegations and construe them in the light most favorable to the non-moving party.

Motions to Dismiss a counterclaim are evaluated pursuant to a three-pronged approach. First, the Court must identify the essential elements of the plaintiff's cause of action. Second, the Court evaluates whether the counterclaim sets forth factual allegations as opposed to conclusory statements; the former it accepts as true, and the latter it disregards. See Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009). Third, if the counterclaim sets forth factual allegations, the Court must determine whether they support a claim to relief that is plausible on its face. See Iqbal, 550 U.S. at 570.

A counterclaim must go beyond alleging an entitlement to relief. "[It] has to 'show' such an entitlement with its facts." Fowler, 578 F.3d at 211 (citing Phillips, 515 F.3d at 234-35). As the Supreme Court stated in Iqbal, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the [counterclaim] has alleged – but it has not 'show[n]'-

3

'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Determining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. This standard does not impose a probability requirement at the pleading stage, but instead requires that the facts alleged be sufficient to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of the claims made. See Matrixx Initiatives, Inc. v. Siracusano, ___ U.S. ___, 131 S.Ct.1309, 1312 (2011) (citing Twombly, 550 U.S. at 556; Phillips, 515 F.3d at 234).

### C. Discussion

1. Relevant Provisions of the SPA

In order to place the parties' dispute in context, the Court turns first to the provisions of the SPA bearing on the valuation of Cirro's working capital. Article I § 1.1, the definitions portion of the Agreement, gives the following meanings to relevant terms:

> "GAAP" means United States generally accepted accounting principles, consistently applied.

> "Net Working Capital" means the amount (which may be a positive or negative number) by which the aggregate amount of the Current Assets exceeds the aggregate amount of the Current Liabilities as [of] the Closing Date, in each case calculated in accordance with GAPP applied on a basis consistent with the Company's audited financial statements, except as otherwise provided herein. For purposed of clarification, in calculating Net Working Capital, Current Assets and Current Liabilities shall consist of the net book value of the line items categories of assets and liabilities set forth on Schedule 1.1(a).

Section 2.3 of the Agreement details how calculation of the Net Working Capital Adjustment was to be finalized. Because these provisions are at the crux of the pending Motion, the Court includes them here:

(a) The [Sellers'] Representative [Tim Rogers] shall deliver to Buyer the Estimated Working Capital Statement no later than two (2) Business Days prior to the Closing Date. The Estimated working Capital Statement, including the Estimated Adjustment Amount, shall be subject to Buyer's approval.

(b) As promptly as practicable, but in no event later than one hundred and twenty (120) days after the Closing, the Buyer shall prepare and deliver to the Representative (i) the Certified Working Capital Statement, and (ii) any work papers related to the calculations set out in the Certified Working Capital Statement. The Certified Working Capital Statement shall become final and binding upon the parties on the date that is thirty (30) days following the Representative's receipt thereof; provided, however, that in the event that Representative objects in good faith to any item on the Certified Working Capital Statement, the Representative shall so advise the Buyer by delivery to the Buyer of a written notice (the "Objection Notice") within such thirty (30) day period. The Objection Notice shall set forth the reasons for Representative's objection as well as the amount in dispute and reasonable details of the calculation of such amount.

(c) The Representative and the Buyer shall attempt in good faith to resolve all of the items in dispute set forth in any Objection Notice within ten (10) Business Days of receipt of the Objection Notice by the Buyer. Any items in dispute not resolved within such ten (10) Business Day period may be referred at any time thereafter by the Representative or the Buyer to Independent Accountants. *The Independent Accountant[ ] shall act as an expert and not as an arbitrator* and shall be required to determine the items in dispute that have been referred to it as soon as reasonably practicable, but in any event not later than thirty (30) days after the date of the referral of the dispute to it. In making its determination, the Independent Accountant[ ] will only consider the issues in dispute placed before it. The Representative and the Buyer shall provide or make available all documents and information as are reasonably required by the Independent Accountants to make their determination. The Independent Accountants shall make their decision solely on the basis of the evidence and position papers presented to them . . . *The determination of the Independent Accountants shall be final and binding on the parties* and the Certified Working Capital Statement shall be adjusted if and as required by such determination . . . .

(emphasis added).

### 2. Defendants' Assertions in Support of Counterclaim III

The substance of Counterclaim III is spare:

> Dominion breached Section 2.3 of the Stock Purchase Agreement by failing to prepare the Certified Working Capital Statement in accordance with GAAP. In particular, the Profit and loss Statements Dominion relied upon contain misstatements regarding payroll; Dominion did not properly account for customer accounts whose billing cycles did not end on September 15, 2008, but on some other day in that monthly cycle; and Dominion unfairly taxed Sellers with the impact of Hurricane Ike on electricity meter reading and Cirro's bad debt. As a result, Sellers have overpaid with respect to the Shortfall Reduction.

[Id. at ¶ 57]. In their Brief in Opposition to the Motion to Dismiss Count III [ECF No. 41] Defendants state four grounds which they allege support denial of the Motion. First, they argue that the SPA contained conditions precedent that were not satisfied before the working capital dispute was submitted to the independent accountant. [Id. at 1]. "Plaintiff failed to provide the work papers 'related to the calculations' to Defendants as requested in Defendants' Objection Notice." [Id.].

Defendants next contend that the information Dominion submitted to the accountant was not prepared and reviewed in accordance with "United States generally accepted accounting principles, consistently applied ("GAAP") as the Agreement required. [ECF No. 1-2 at 5]. Defendants also maintain that they are "prepared to present evidence that Plaintiff and [the accounting firm] acted with bad faith and partiality when they performed their work." [Id.]. Finally, Defendants argue that the accountants expressed opinions regarding current tax assets, and that these opinions "[are] susceptible to attack" because they exceeded the scope of the authority granted to the accounting firm under the terms of the Agreement. [Id.].

3. Dominion's Contention that Counterclaim III Fails to State a Cause of Action

Dominion argues that Defendants contracted away their "legal ability to challenge the accountant's working capital calculations." [ECF No. 39 at 5; ECF No. 1-2 §2.3(c)]. The basis for this argument is the general principle of law that "[t]he district court affords [an] arbitrator's decisions 'an extraordinary level of deference' and confirms them 'so long as the arbitrator [has] even arguably constru[ed] or applied[ed] the contract and act[ed] within the scope of his authority.'" Crawford Group, Inc. v. Holekamp, 543 F.3d 971, 976 (8th Cir. 2008) (quoting Stark v. Sandberg, Phoenix & von Gontard, P.C., 381 F.3d 793, 798 (8th Cir. 2004)). "Judicial review of an arbitration award has been characterized as 'among the narrowest known to the law.'" Westvaco Corp. v. United Paperworkers Int'l Union, AFL-CIO, 171 F.3d 971, 974 (4th Cir. 1999) (quoting Union Pac. R.R. v. Sheehan, 439 U.S. 90, 91 (1978)). Except in the rarest cases, courts must uphold and enforce arbitral awards.

4. Was the Accountant's Examination an Arbitration?

A court deciding whether parties have agreed to arbitrate a dispute acts as a "gatekeeper." See Air Line Pilots Ass'n, Int'l v. Midwest Express Airlines, Inc., 279 F.3d 553 (7th Cir. 2001). "If the parties have in fact agreed to [arbitration], then they have bargained for the arbitrator's interpretation of their contract – not [the Court's]." United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union v. Trimas Corp., 531 F.3d 531, 536 (7th Cir. 2008).

Defendants attempt to avoid application of the presumption that arbitration awards are final, by pointing to the following SPA provision: "The Independent Accountant [ ] shall act as an expert and not as an arbitrator . . . ." [ECF No. 1-2 at §2.3(c)]. They argue that by virtue of this language, the SPA dispute resolution process was not "tantamount to arbitration." [ECF No.

41 at 6]. Because there was no arbitration, the accountant's treatment of the working capital issue is not entitled to the deference that would apply had there been arbitration.

The Court does not find that the SPA language cited by the Defendants is ambiguous with respect to the parties' intention that the working capital issue be resolved conclusively by the accountant. The case law supports the Court's position.[3] In a case similar to this one, Omni Tech Corp. v. MPC Solutions Sales, LLC, and MPC Computers, LLC, 432 F.3d 797 (7th Cir. 2005), Omni Tech sold one of its divisions to MPC Solutions. The contract of sale provided for adjustments to net working capital. In drafting the contract, the parties, recognizing that the working capital valuation was likely to be the subject of disagreement, included provisions for resolving this issue: "[The parties] shall refer their remaining differences to [an accounting firm that] shall, acting as experts and not as arbitrators, determine solely on the basis of the standards set forth [in another section of the contract] . . . whether and to what extent, if any, the Final Net Working Capital requires adjustment . . . The determination of the Independent Accountant shall

---

[3] The Federal Arbitration Act, 9 U.S.C. §1 et seq., ("FAA") which embodies a liberal federal policy favoring arbitration "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 844 (2d Cir. 1987) (quoting Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985)). The FAA was enacted to "reverse the longstanding judicial hostility to arbitration agreements." Manifest Corp. v. Random House, Inc., Civil No. 07-254-KL, 2007 WL 1974911, at * 3 (D. Or. July 2, 2007) (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991).

The FAA does not contain in its provisions or its legislative history, an explicit definition of the term "arbitration." The same is true of the Uniform Arbitration Act, the template used by most states in formulating their own legislation governing arbitration. Thus, "it is incumbent upon courts to reach their own conclusions regarding the scope of application of arbitration law." Thomas J. Stipanowich, The Arbitration Penumbra: Arbitration Law and the Rapidly Changing Landscape of Dispute Resolution, 8 Nev. L.J. 427, 435 (2007).

Most courts have identified "at least four 'signifying elements' of procedures that, when framed in an agreement, fall within the scope of arbitration law: (a) a process to settle disputes between parties; (b) a neutral third party; (c) an opportunity for the parties to be heard; and (d) a final, binding decision, or award by the third party after the hearing." Id. at 435-36. See also DOMKE ON COMMERCIAL ARBITRATION, 8:7 (3d ed. 2011) (contract language need not incorporate the word "arbitration" if contract otherwise manifests this intent) (footnote omitted).

8

be final, conclusive and binding upon [the parties]." Id. at 798.

When the anticipated disagreement came to fruition, Omni Tech filed suit in federal court, relying on diversity jurisdiction. MPC asked that the court stay or dismiss the suit so that the accountant could reach the "final, conclusive and binding decision" per the terms of the contract. The District Court denied MPC's request, concluding that because the accountant had been termed an expert rather than an arbitrator, the contract did not constitute an arbitration clause precluding judicial review. The Court of Appeals reversed, writing:

> The district court assumed that it may ignore any form of alternative dispute resolution other than "arbitration." Why would that be so? Many contracts have venue or forum-selection clauses. These do not call for "arbitration" but are routinely enforced, even when they send the dispute for resolution outside the court's jurisdiction.

Id. at 799 (internal citations omitted).

The Court concluded that provisions similar to the one in the governing agreement had been construed to provide for arbitration: "Names are unimportant . . . ; what matters is that [state law] respects the parties' ability to make agreements of this kind." Id. The Court explained that calling the decision maker an "expert" rather than an "arbiter" was not dispositive of the arbitration issue:

> The statement that [the accountant] will act as an expert and not as an arbitrator means that it will resolve the dispute as accountants do – by examining the corporate books and applying normal accounting principles plus any special definitions the parties may have adopted- rather than by entertaining arguments from lawyers and listening to testimony. It does not imply that the whole section of the contract committing resolution to an independent private party is horatory. Thus the provision for the "final, conclusive and binding" resolution of this dispute by someone other than a federal judge must be honored; the judge is no more entitled to ignore it than he could ignore the contract's detailed definition of "net working capital."

Id.

Under Delaware law, which, by the parties' agreement, governs issues arising under the SPA, "when the parties establish a binding resolution procedure similar to arbitration, courts typically should not interfere with the decision resulting from that procedure other than in the most egregious circumstances, *i.e.*, where the Delaware Uniform Arbitration Act ("DUAA") allows a court to modify or vacate an arbitral award." Julian v. Julian, Civ. Act. No. 1892-VCP, 2010 WL 1068192 at * 11 (Del. Ch. March 22, 2010). Under the DUAA:

> Courts "may vacate an arbitral award only if (1) the award was procured by fraud or other undue means, (2) the arbitrator exhibited clear impartiality or corruption, (3) the arbitrator exceeded or imperfectly executed his authority, (4) the arbitrator refused to appropriately postpone a hearing, hear material evidence, or guarantee adequate notice or due process, or (5) no valid arbitration procedure existed, the terms of that agreement were not complied with, or the arbitrated claim was barred by a time limitation."

Id. at n. 83 (citation omitted). The conditions of review are virtually identical under the common law. "Under common law arbitration, 'the award of an arbitrator . . . is binding and may not be vacated or modified unless it is clearly shown that a party was denied a hearing or that fraud, misconduct, corruption or other irregularity caused the rendition of an unjust, inequitable, or unconscionable award." Wayne v. Chopivsky, 657 F. Supp. 788, 793 (E.D. Pa. 1987) (citations omitted).

Thus, whether the Court looks to federal law, Delaware law, or to the common law, it finds that the SPA at issue in this case did include a provision for arbitration that was meant to be binding. No matter the source of the law, agreements to enter into binding arbitration are encouraged and, most often, are honored. The circumstances that permit a court to interfere with an arbitration decision are narrowly circumscribed, and the Court does not find that any of these circumstances are alleged adequately in Defendants' Counterclaim III.

Defendants seek to avoid finality of the arbitration decision by including in their

10

counterclaim allegations regarding Dominion's failure to follow GAAP, its reliance on misstatements regarding payroll, Dominion's improper treatment of billing cycles for certain customer accounts, and its misallocation of costs attributable to Hurricane Ike. Even assuming, arguendo, that Defendants' allegations could be considered sufficiently egregious to merit judicial consideration of what was intended to be a final arbitration award, they do not come close to satisfying the requirements necessary to sustain a motion filed pursuant to F.R.Civ. P. 12(b)(6). Defendants' allegations of wrongdoing are supported only by conclusory statements. [4] These, the Court is bound to disregard. See Fowler, 578 F.3d at 210–11. A viable counterclaim must set out enough facts to support a claim to relief that is plausible on its face. See Iqbal, 550 U.S. at 570. The Defendants' counterclaim falls well short of this standard.

### III. CONCLUSION

For the reasons set out above, it is respectfully recommended that Dominion's Motion to Dismiss Defendants' Counterclaim III [ECF No. 38] be granted.

In accordance with the Magistrate's Act, 28 U.S.C. § 636 (b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules for Magistrates, objections to this Report and Recommendation must be filed by June 5, 2012. Failure to file timely objections will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n.7 (3d Cir. 2011). Any response to objections is due on or before June 15, 2012.

---

[4] See Commw. of Pa. ex. rel Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir.1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting Car Carriers, Inc. v. Ford Motor Corp., 745 F.2d 1101, 1107 (7th Cir.1984)); See also Unger v. Nat'l Residents Matching Program, 928 F.2d 1392, 1400 (3d Cir.1991)(facts not set forth in complaint cannot be considered by the court in ruling on a motion to dismiss).

Respectfully submitted,

*Cynthia Reed Eddy*
Cynthia Reed Eddy
United States Magistrate Judge

Dated: May 22, 2012

cc: Counsel of record via CM-ECF