IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOMINION RETAIL, INC. | ) | Civ. Action No. 2: 11-cv-00233 |
| | ) | |
| Plaintiff, | ) | Judge Cathy Bissoon/ |
| | ) | Magistrate Judge Cynthia Reed Eddy |
| | ) | |
| v. | ) | |
| | ) | |
| TIM ROGERS, TIM TERRELL, GARY | ) | |
| SHAPIRO, and TIM BELL | ) | |
| | ) | |
| Defendants | ) | |

## REPORT AND RECOMMENDATION

## I. RECOMMENDATION

Pending in this matter, a diversity-based contract dispute over the sale of shares in an energy business, is a Motion for Summary Judgment [ECF No. 51]. Plaintiff buyer seeks to recover an increased assessment in pre-closing federal taxes and state taxes, and the remainder of a shortfall in working capital. Also pending is a Motion for Partial Summary Judgment [ECF No. 56] filed by seller Defendants claiming that Plaintiff is not entitled to attorney's fees associated with its attempt to recover monies allegedly owed. Sellers also argue that if they *are* obligated to pay an increase in Plaintiff's tax bill for 2007, they are entitled to related off sets in other years.[1] It is respectfully recommended that Plaintiff's Motion for Summary Judgment be granted in its entirety, and that Defendants' Motion be denied.

---

[1] In connection with their Motion for Summary Judgment, Defendants have moved to strike certain testimony of Plaintiff's affiant, Winfield Ryan, on the ground that it is not competent evidence. [ECF No. 86 at ¶1]. This Motion will be denied as moot, as the Court did not take this Affidavit into account in considering the Motions for Summary Judgment.

## II.  REPORT

**General Overview of the Issues**

Because the essential facts underlying this matter have been recounted in multiple prior pleadings and are well known to the parties, the Court revisits those facts only insofar as required to provide context for resolution of the pending Motions.  In August 2008, the four individual Defendants ("Defendants" or "Sellers") entered into a Stock Purchase Agreement ("SPA") with Plaintiff, Dominion Retail, Inc. ("Dominion") whereby the Sellers conveyed their stock in Texas electric service provider, Cirro Group, Inc. ("Cirro"), to Dominion.[2] The legal issues to be resolved by the current motions deal with events occurring after the sale, with the parties taking opposite positions with respect to whether the Sellers have outstanding financial obligations to Dominion. In its Motion, Dominion contends that it is entitled to recover pre-closing federal and state taxes, the working capital shortfall as calculated by Accountants Hein and Associates,[3] and attorney's fees associated with maintaining this action against Defendants. [ECF No. 52 at 2-3].

Sellers seek summary judgment on the grounds that they are entitled to an off set of tax refunds made to Dominion in earlier years. Therefore, they are not obligated to indemnify Dominion for the full amount of increased pre-closing federal or state tax, and are not obligated to pay Dominion's attorney's fees in connection with its attempt to secure indemnification. [ECF No. 64 at 20-21].

---

[2]Throughout the pleadings, the parties refer to related entities Cirro and Dominion.  Where the difference in name is immaterial to the legal analysis, the Court attempts to simplify the discussion by referring simply to Dominion.

[3] Sellers' obligation to pay a determined amount of the working capital shortfall as calculated by accountants Hein and Associates has been established by this Court and there is no reason to revisit this issue. See [ECF No. 90].  Dominion is, therefore, entitled to summary judgment with respect to this claim.

**Standard of Review**

Summary Judgment is appropriate only where there are no genuine issues of material fact. <u>Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 248 (1986). While the moving party must demonstrate the absence of any genuine factual dispute, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323(1986), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." <u>Matsushita</u>, 475 U.S. at 586-87 (1986) (emphasis in original removed).

In evaluating the evidence, the Court must view the facts and the inferences to be drawn therefrom in a light most favorable to the non-moving party. <u>Anderson</u>, 477 U.S. at 255. At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. <u>See</u> <u>id.</u> at 249. When examining the record to see if there are genuine issues of material fact, the Court's focus is on issue finding, not on issue resolution.

**Discussion**

1. <u>Defendants' Obligation to Indemnify Dominion for the Increase in Assessed Federal Taxes</u>

a. The Issue

In April 2009, eight months following execution of the SPA, the Internal Revenue Service ("IRS") conducted an audit disallowing certain bad debt deductions made by Dominion. As a result, Dominion's "2007 corporate net income [was] increased by $1,826,611." [ECF No. 26 at ¶16]. The IRS ultimately proposed a settlement fixing the increase at $1,340,547. [<u>Id.</u> at ¶

17].  Dominion advised Defendants of the settlement terms, and Defendants recommended that the compromise be accepted. Dominion paid the additional taxes, and demanded that Sellers indemnify it for a share of that payment in accordance with the terms of the SPA.  [ECF No. 1 at ¶¶ 17, 19, 20, 21].  "Dominion did not [immediately] demand the full amount of additional federal income tax actually paid in . . . settlement of the IRS Audit"  because it sought "to compromise and settle the claim promptly." [Id. at ¶ 21].

Defendants have refused to remit any portion of the increased tax assessment to Dominion. [Id. at ¶¶ 22 -25].  After multiple futile demands for payment, Dominion raised its demand by $53,875.89 to include interest due on the additional federal tax.  Dominion now contends that "[u]nder the terms of the Stock Purchase Agreement, it is entitled to payment from Defendants in the amount of $509,661.89," representing taxes, and interest assessed as a result of the 2007 audit. [Id. at ¶ 26].

Sellers counter that they are not obligated to pay this amount because, as a direct result of the 2007 audit, "Dominion caused Cirro's tax returns to be amended for the years 2005, 2006, and the short period end[ing] September 15, 2008 to take certain understated and disallowed bad debt deductions in those years, which resulted in tax *benefits* to Cirro." [ECF No. 64 at 4-5] (emphasis added).  According to Sellers, any amount to which Dominion might be entitled as a result of the 2007 IRS audit "must include the offsets in the amounts of those benefits so as to compensate Dominion for its actual loss and prevent a double recovery."  [Id. at 5].  In other words, "Dominion cannot 'take the good' and 'ignore the bad,' and . . . must account for [the] tax benefits" realized when the returns for 2005, 2006, and part of 2008 were amended." [Id. at 5 n.4].  Sellers calculate that after the relevant offsets, Dominion would owe $133,274 in additional taxes, making this the cap on Sellers' potential liability. [Id. at 10].

Dominion bases its claim for the *full* amount of the additional federal taxes and interest on Article XII "Certain Tax Matters," Section 12.1 of the SPA. [ECF No. 59-1 at 56], which reads in relevant part:

> 12.1 **Tax Indemnification.** The Sellers shall jointly and severally indemnify [Cirro, its subsidiary, Dominion,] and each Affiliate of [Dominion] and hold them harmless from and against any loss, claim, liability, expense, or other damage attributable to: (i) to [sic] the extent not provided in the Final Working Capital Statement, all Taxes (or the non-payment thereof) of [Cirro or its subsidiary Dominion] for all Taxable periods ending on or before [September 15, 2008] and for the portion through the end of [that] Closing Date of and Taxable period that includes, but does not end on, the Closing Date ("pre-Closing Tax Period") . . . .

[ECF 59-1 ¶ 12.1].

Dominion argues that this "provision expressly requires the Defendants to indemnify [it] from any and all tax obligations arising from taxable periods prior to the SPA closing date." [ECF No. 52 at 3]. Dominion contends, too, that by the terms of the SPA, the scope of Sellers' duty to indemnify is broad. This is illustrated by the definition of "Tax" set forth in Article I, Section 1.1 of the SPA:

> "Tax" means all taxes, however denominated, including any interest, penalties or other additions to tax that may become payable in respect thereof, imposed by any Governmental Authority, which taxes shall include, without limiting the generality of the foregoing, all income or profits taxes (including, but not limited to, federal state and local income taxes) . . . whether disputed or not, together with all interest, penalties, and additions imposed with respect thereto . . . .

[ECF No. 59 at 1.1]. Dominion also states that "the SPA does not contain any language authorizing the Defendants to use tax benefits to setoff . . . liabilities or otherwise give the Defendants any rights to such tax benefits." [ECF No. 52 at 4].

The Court agrees with Dominion's assertion that "the unambiguous language of the SPA requires the Defendants to indemnify Dominion for all pre-closing tax liabilities." [Id.]  The record does not demonstrate that Sellers, upon receiving notification of its obligation to indemnify Dominion, contested that obligation under the SPA, nor do they do so in the context of summary judgment. To avoid full payment, Sellers rely instead on an addendum to the SPA executed on or just prior to the Closing Date (the 'Waiver Letter'). [Id. at 5].  Under the terms of that letter, "Dominion agreed to give the Defendants the benefit of one specific tax benefit, and then confirmed that the Defendants had no right to any other refunds. Paragraph Five of the Waiver Letter reads:

> 5. <u>Waiver of Refund</u>.  The parties hereby acknowledge that
> The Estimated Working Capital Statement delivered to the
> Buyer includes the Tax benefit of payments made by the
> Company to holders of Stock Awards and Phantom Shares.
> On behalf of the Sellers, the Representative [Defendant
> Rogers] hereby acknowledges and agrees that the Sellers shall
> have no rights to any Tax refunds received by the Company,
> the Buyer or any of their Affiliates, and on behalf of the
> Sellers, the Representative hereby waives any claim the
> Sellers may have with respect to any such Tax refunds.

[ECF No 59-1 at 71].  According to Dominion: "Because SPA Section 12.1 and the Waiver letter are unambiguous on their face, both requiring the Defendants to indemnify Dominion for its 2007 $509,661.89 tax payment without offsets for tax refunds from 2005, 2006, 2008, or any other year, Dominion is entitled to summary judgment . . . without reference to the parties' subjective intent." [ECF No. 52 at 5].

Sellers do not reference the terms of the SPA, or any other source in asserting their right to offsets. Instead, they proceed directly to the Waiver Letter which, they argue, does not preclude their "right" to off sets resulting from the 2007 IRS audit. In support of this contention, Sellers assert first that Delaware law will not recognize a waiver unless it can be shown that the

waiving party "knowingly relinquished a right." [ECF No. 56 at 2]. "Sellers could not possibly have waived the right to receive refunds in September 2008, when those refunds resulted from an audit that was noticed by the IRS eight months later." [Id.]. This argument, ignores the source of the claimed right, begins at the wrong place, and turns the law on its head. See Davis v. Holman, 354 F.2d 773, 776 (5th Cir. 1965) ("A waiver in any kind of a case, is an intentional relinquishment of an existing right. 'The right . . . allegedly waived must be in existence and be known to exist by the party possessing it.'") (internal citation omitted). See also Kristensen ex rel. Kristensen v. Spotnitz, No. 3:09-cv-00084, 2011 WL 4458974 at * 5 (D. Va. Sept. 26, 2011) ("[O]ne cannot waive a right that one does not possess."); Brookwood, LLC v. Scottsdale Ins. Co., Civil Action No. 08-4793, 2009 WL 2525756 at *4 (E.D. La. Aug. 17, 2009) (doctrine of waiver apples only to an existing legal right); Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 547 n.55 (5th Cir. 2004) (articulating basic principle of contract law: "[I]t is essential to waiver that the right allegedly waived exist at the time of the waiver; a party may not waive any right it does not yet have." 13 LORD, WILLISTON ON CONTRACTS, § 39.10 n.12 (4th ed. 2000) (footnotes omitted)). Delaware law is in accord. See Tuckman v. Aerosonic Corp., 394 A.2d 226 (Del. Ch. 1978). In the circumstances presented, the doctrine of waiver simply does not apply. Sellers have failed to establish that they had a right to off set refunds due Dominion against assessments for which Sellers were contractually bound under the SPA to indemnify Dominion.

Sellers' discussion of the Waiver Letter does nothing to help them establish the right to an offset. They do not contend, nor, based on the language of the Letter, could they plausibly contend that the Letter provided them with offset rights. Sellers rely on the terms of the Letter in an effort to limit their indemnification obligations under the SPA. Again referring to their

"rights" to tax refunds – a right that has not been established by anything in the record - Sellers contend that according to the terms of the Waiver Letter, they relinquished their refund rights only in connection with "[t]ax benefit[s] made by the Company to holders of Stock Awards and Phantom Stocks." [ECF No. 58 at 10]. Sellers also address language in the Letter, which reads: "On behalf of the Sellers, the Representative [Defendant Rogers] hereby acknowledges and agrees that the Sellers shall have no rights to any Tax refunds received by the Company, the Buyer or any of their Affiliates, and on behalf of the Sellers, the Representative hereby waives any claim the Sellers may have with respect to any such tax funds." [Id.] Sellers, without amplification, assert: "[E]ven if the Court were to construe the letter agreement to include a waiver of 'all tax refunds,' that waiver would include only Sellers' right to receive cash[4] . . . Given that Delaware law[5] limits indemnification claims to a party's actual losses, the . . . letter agreement cannot be construed to result in Sellers having agreed that Dominion would not offset the tax benefits against the additional tax liability, all resulting from the same 2007 IRS Audit." [Id.]. Relying on the Waiver Letter, Sellers thus attempt to undo the indemnification obligation imposed by the SPA.

    b. Delaware Law – Principles of Contract Interpretation

    Resolution of the indemnification issue turns on the proper interpretation of relevant provisions of the SPA and the supplementary Waiver Letter. "Under Delaware law, the Court must give 'priority to the parties' intentions as reflected in the four corners of the agreement' when interpreting a contract." Buyse v. Colonial Sec. Serv., Inc., C.A. No. N10C-08-012 JRS, at

---

[4] The Sellers do not explain how they arrive at the conclusion that only the right to receive cash is nullified by the Waiver Letter, nor do they explain how receiving an offset is, in this context, any different from receiving a refund.

[5] The SPA, by its terms, is to be "construed and enforced in accordance with the laws of Delaware." [ECF No. 59. at § 13.1].

*2 (Del. Super. July 19, 2012) (quoting <u>GMG Cap. Invs., LLC v. Athenian Venture Partners I,</u> <u>L.P.</u>, 36 A.3d 776, 779 (Del. 2012)). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." <u>Middletown Sq. Assoc. v.</u> <u>Jasinski</u>, No.10NC-04-019 MMJ, 2012 WL 6042639 at *2 (Del. Super. Dec. 04, 2012) (quoting <u>GMG Capital Invs.</u>, 36 A.3d at 780)). <u>See</u> <u>also</u> <u>Rhone–Poulenc Basic Chems. Co v. Am.</u> <u>Motorists Ins. Co.</u>, 616 A.2d 1192, 1196 (Del. 1992) ("Ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends.'") (internal quotation omitted).

"Whether a contract or contractual term is ambiguous is a question of law for the court to decide." <u>Id.</u> (citing <u>O'Brien v. Progressive N. Ins. Co.</u>, 785 A.2d 281, 286 (Del. 2001). The mere fact that the parties dispute the meaning of a contract term does not render it ambiguous. <u>Middletown Sq. Assoc.</u>, 2012 WL 6042639 at * 3 (citing <u>GMG Capital Invs</u>, 36 A.3d at 780). "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." <u>Id.</u> (internal citations omitted).

"[W]here reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence." <u>Id.</u> (citing <u>GMC Cap.</u> <u>Invs,</u> 36 A.3d at 779). "Summary judgment may still be appropriate, however, if 'the moving party's record is not <u>prima</u> <u>facie</u> rebutted so as to create material issues of fact.'" <u>Id.</u> (quoting <u>GMG Capital Inves,</u> 36 A.2d at 784). Thus, "[in] cases involving questions of contract interpretation, a court will grant summary judgment under either of two scenarios: when the

contract in question is unambiguous, or when the extrinsic evidence in the record fails to create a triable issue of material fact and judgment as a matter of law is appropriate." Id. (quoting GRT, Inc. v. Marathon GTF Tech., Ltd., Civil Action No. 5571-CS, 2012 WL 2356489 at *4 (Del. Ch. June 21, 2012)).

c. The Provisions of the SPA

For purposes of determining Sellers' responsibility for the revised 2007 IRS tax assessment, the terms of the SPA are not in dispute. In their respective Motions for Summary Judgment, the parties do not assert that the SPA provisions are ambiguous, nor do they differ in their interpretation of its terms. They agree that, pursuant to the SPA, Sellers agreed to indemnify and hold Dominion harmless "to the extent not provided in the Final Working Capital Statement, [from] all Taxes (or the non-payment thereof) of [Cirro or its subsidiary Dominion] for all Taxable periods ending on or before [September 15, 2008] and for the portion through the end of [that] Closing Date of and Taxable period that includes, but does not end on, the Closing Date . . . ." SPA, Article I, Section 12.1 [ECF No. 59-1 at 56]. The tax assessment at issue clearly falls within those parameters. It is also undisputed that the SPA's definition of the term "Tax" applies to "all taxes, however denominated, including any interest, penalties or other additions to tax that may become payable in respect thereof, imposed by any Governmental Authority . . . whether disputed or not, together with all interest, penalties, and additions imposed with respect thereto . . . . [Id. at 20]. Sellers' contention that it is not obligated to pay the revised 2007 tax assessment is not based on the language of the SPA. Instead, Sellers argue that their tax liability for that year should be reduced to zero, or a fraction of what was assessed, based on the fact that the IRS audit increased Dominion's 2007 taxes, but, at the same time, entitled it to claim refunds

for taxes paid in prior years.[6] Dominion responds that Sellers have no basis for claiming the benefit of those refunds.

The focus of the parties rests on Paragraph Five of the Waiver Letter, which, as the Court has already stated, reads:

> <u>Waiver of Refund</u>.  The parties hereby acknowledge that the Estimated Working Capital Statement delivered to the Buyer includes the Tax benefit of payments made by the Company to holders of Stock Awards and Phantom Shares. On behalf of the Sellers, the Representative [Defendant Rogers] hereby acknowledges and agrees that the Sellers shall have no rights to any Tax refunds received by the Company, the Buyer or any of their Affiliates, and on behalf of the Sellers, the Representative hereby waives any claim the Sellers may have with respect to any such Tax refunds.

[ECF No 59-1 at 71].   Dominion contends that the last sentence of this provision negates the Sellers' contention that they are entitled to offset tax refunds made as a result of the 2007 IRS audit, this sentence nullifies Seller's right to *any* tax refund. According to Dominion, the first sentence of paragraph 5 of the Waiver Letter gave the Defendants (or clarified that they had already received) the right to a particular tax benefit related to phantom stock[7] shares – and the second sentence clarified that Dominion retained the right to all other tax benefits."  [ECF No. 52 at 6].

---

[6] In the narration of facts underlying their first counterclaim, sellers allege a multiplicity of shortcomings associated with Dominion's participation in the IRS audit. They do not, however, raise these accounting issues in opposition to Dominion's summary judgment claim.

[7] "[P]hantom stock is not actually stock. It has been defined as "[a] right . . . to receive an award with a value equal to the appreciation of a share of stock from the date that Phantom Stock is cashed out .   .   .  . Phantom Stock programs are designed to provide executives with cash payments equivalent to amounts they could receive under an actual stock option or similar program . . . . Phantom programs are based on 'phantom' or 'hypothetical' shares or units." <u>Whitt v. Sherman Corp.,</u> 147 F.3d 1325, 1327 (11th Cir. 1998) (quoting Coopers & Lybrand, *Executive Summary of Nonqualified Long Term Incentive Plans*, CV01 ALI-ABA 619, 632 (1996).

Sellers interpret this paragraph more narrowly, stating that it is restricted to "a tax benefit associated with 'payments made by the Company to holders of stock Awards and Phantom Shares' as being included in the Estimated Working Capital Statement." [ECF No. 56 at 10]. "Because Sellers left this tax benefit with Cirro as part of the Stock Purchase transaction (and received credit for it on the working capital statement), it would make no sense for Sellers to retain the right to receive any of the tax benefits associated with this tax benefit." [Id.]. According to Sellers, it is simply too broad a reading of the Waiver Letter to construe it "to eliminate refund amounts and tax benefits resulting from an increased Net Operating Loss (NOL) from the calculation of any additional tax liabilities for which sellers must indemnify Dominion." [Id.].

Having considered the parties' positions against the background of the Waiver Letter, the Court finds it unreasonable to read the Letter to modify Sellers' indemnification obligations in any way. It does not allude to offsets or any other limit on the indemnification provided for in the SPA. It simply clarifies that the Sellers are entitled to credit for one particular benefit, and no others. In order to avoid what the Court finds is the clear meaning[8] of the Letter, Sellers return

_____

[8]Though the Court finds unequivocally that there is no ambiguity in the Waiver Letter to require resort to extrinsic evidence and Sellers do not make this argument, in an abundance of caution, the Court notes that what extrinsic evidence is included in the record was submitted by Dominion and supports Dominion's reading of the letter. At her video deposition, Alison Nawrocki, manager of a division of Dominion's Tax Department, testified that she participated in drafting the Waiver Letter. See [ECF No. 53-1 at 137]. She explained that the first sentence in Paragraph 5 of that Letter was included as a "separate agreement that was made a few days prior to closing" in order to clarify that "a different agreement [had been] made to allow the tax benefit of the phantom share and stock award deduction to be included in the working capital statement [because this was] not consistent with the stock purchase agreement." Id. The second sentence was to clarify that "[Dominion] was not waiving [its] rights to any additional refunds, which we would be entitled to under the general fund of the stock purchase agreement." Id.

At his deposition, Tim Rogers ("Rogers), Sellers' representative, testified that he had not located or even looked for language in the SPA, referencing Sellers' right to an offset. [ECF No. 52 at 6]. Rogers also signed the Waiver Letter. At his deposition, he was asked: "Okay. You

to an argument that ignores entirely the fact that nothing in the record establishes that it had any right to an offset which could have been waived.

Sellers argue that were unaware of any right to offset they may have been waiving in the Waiver Letter. This is, of course, because the SPA gave them no such right. Next, Sellers contend that none of the language in the Waiver Letter suffices to effect waiver of an offset, because, at the time the letter was signed, Sellers had no reason to know that there would be an audit of a return it had prepared, or that the result of that audit would permit alteration of other returns which Sellers also prepared. "[D]ominion did not receive notice of the 2007 Audit until seven months after [the Waiver letter] on April 15, 2009, and did not inform Sellers of the audit until [eight days later]." Thus, according to Sellers, at the time of the Waiver Letter, they could not have waived a known right.

This argument is strained. At the time of the Waiver Letter, it would have been clear to all parties that the IRS was entitled to conduct an audit of any open tax year prior to the closing of the sale. Although the results of an audit can never be assured ahead of time, the business savvy parties and sophisticated counsel representing them could well have anticipated that additional taxes might be assessed, and that an audit could have an impact on returns filed in other covered years. More specific knowledge could not have been available at the time, and what was known was not, in the Court's view, so inchoate as to preclude a waiver within the meaning of Delaware law. What took place was well within the realm of predictability. The Court finds nothing ambiguous in the Waiver Letter.

---

waived the right for the [Sellers] to derive any benefit from those [tax] refunds?" Rogers answered: "Right." [ECF No. 53-1 at 140].

Other than arguing that Nawrocki used the phrase "tax refund" rather than "setoff," the Sellers have failed to cite any record evidence establishing their right to a offset. Thus, looking to extrinsic evidence would not have altered the Court's conclusion that Sellers had no such right.

What Sellers *did* know was that they had a contractual obligation to indemnify Dominion for any liability that Dominion may have incurred *as the result of Sellers' preparation* of relevant tax returns. Though this may, at first blush, seem unfair, parties with comparable bargaining power are free to contract as they will. Here, each side was thoroughly and ably counseled. It would not, therefore, have been complicated to address Sellers' entitlement to an offset in the section of the SPA discussing indemnification. This was not done. The parties are, despite hindsight, bound by what they contracted to do. See generally Darby Anesthesia Assoc., Inc. v. Anesthesia Bus.Consult., LLC, Civil Action No. 06-1565, 2008 WL 2845587 at *4-5 (E.D. Pa. July 23, 2008). The Court thus finds that Dominion is entitled to summary judgment on the issue of its right to indemnification for additional federal taxes and interest assessed in the relevant years.

2. The Issue of Increased State Taxes

Dominion's contention that it is entitled to indemnity for sales and use tax paid by Dominion to the State of Texas for pre-closing periods and Sellers' opposition to that contention are, again, contractual issues controlled by the language of the SPA. Dominion cites Article XII "Certain Tax Matters," set forth in Section 12.1 of the SPA. [ECF No. 59-1 at 56], contending that this section entitles it to indemnity for sales and use tax paid by Dominion to the State of Texas for increased assessments made pursuant to an audit which postdated closing of the deal between Dominion and the Sellers. This Section reads, in relevant part:

> 12.1 **Tax Indemnification.** The Sellers shall jointly and
> severally indemnify [Cirro, its subsidiary, Dominion,] and
> each Affiliate of [Dominion] and hold them harmless from
> and against any loss, claim, liability, expense, or other damage
> attributable to: (i) to the extent not provided in the Final
> Working Capital Statement, all Taxes (or the non-payment
> thereof) of [Cirro or its subsidiary Dominion] for all Taxable
> periods ending on or before [September 15, 2008] and for the

14

> portion through the end of [that] Closing Date of and Taxable period that includes, but does not end on, the Closing Date ("pre-Closing Tax Period") . . . .

[ECF 59-1 ¶ 12.1]. Sellers recognize that this section of the SPA obligates them to indemnify Dominion for payments associated with the pre-closing period Texas Sales and Use assessments, and did not challenge this obligation prior to filing a Counterclaim well into this litigation. Responding to Dominion's Motion for Summary Judgment with respect to the state taxes, Sellers reiterate the substance of that Counterclaim, contending that they are not obligated to indemnify Dominion for the revised state sales and use tax assessments because Dominion "wholly ignored critical steps in conducting the sales tax audit, as it kept . . . [Sellers] . . . meaningfully out of the audit process.'[ECF. No. 64 at 13]. The Court finds that this argument lacks merit.

The Court's analysis of the Sellers' position turns on rather lengthy portions of Article XI of Section 11.1 of the SPA, entitled Indemnity and Warranty. [ECF No. 59-1 at 51]. In order to provide context for its discussion of the Texas audit, it is necessary that the Court quote and refer back to the following substantial excerpts from that Section:

> **11.1    The Buyer's Indemnity.**  From and after the Closing Date, the Buyer shall indemnify and hold harmless the Sellers . . . from and against any claim, liability, loss, cost, damage or expense including costs and reasonable attorney's fees and expenses (any of the foregoing constituting a ("Claim") arising out of or resulting from the Breach of, or the failure to perform or satisfy any of, the representations, warranties and covenants made by the Buyer in the Agreement. In addition to the Foregoing, the Buyer shall reimburse the Seller Indemnified parties for any legal or other expenses incurred by the Seller Indemnified Parties in connection with investigating or defending any such Claim that is the Claim of a third party as such expenses are incurred.
>
> **11.2 The Sellers' Indemnity**.  From and after the Closing Date, the Sellers, jointly and severally, shall indemnify and hold harmless the Buyer . . . (the "Buyer Affiliated Parties") from and against any Claim arising out of or resulting from:

(c) any Taxes paid by the Sellers hereunder . . . .

In addition to the foregoing, the Seller shall reimburse the Buyer Indemnified Parties for any legal or other expenses incurred by the Buyer Indemnified Parties in connection with investigating or defending any such Claim that is the Claim of a third party as such expenses are incurred.

### 11.3  Claim Notice

(a) Indemnified Parties.  As used in this **Article XI**, the term "Indemnified Party" shall mean any Seller Indemnified or any Buyer Indemnified Party, as the case may be, that is asserting a claim for indemnity hereunder.  Any party against which a claim for indemnification is asserted by an Indemnified Party pursuant to this Article XI is referred to herein as an "Indemnifying Party."  In the event that any Claims are asserted against or sought to be collected from an Indemnified Party by a person who is not a Buyer Indemnified Party or a Seller Indemnified Party (a "Third Party"), such Indemnified Party shall give prompt written notice to the Indemnifying Party of such event ("Claim Notice").  A Claim Notice shall specify, to the extent known by the Indemnified Party, the nature of and specific basis for any Claims or to the extent known by the Indemnified Party, the nature of and specific basis for any Claims or the nature of and specific basis of any suit, action, investigation or proceeding set forth therein and the amount or the good faith estimated amount thereof to the extent then practicable. Any failure on the part of any Indemnified party promptly to provide a Claim Notice to the Indemnifying Party shall relieve the Indemnifying Party of such party's obligation under this Article only to the extent that the Indemnifying Party shall have been prejudiced by the lack of timely and adequate notice to the Indemnifying Party.

(b) Notice Required. The Indemnifying Party shall have thirty (30) days after the delivery or receipt of a Claim Notice. ("Notice Period") to notify the Indemnified Party (i) whether or not it disputes the liability of the Indemnifying Party to the Indemnified Party hereunder with respect to the Claims identified in the Claim Notice, and (ii) whether or not it desires to assume the defense of the Third Party Claim identified in the Claim Notice; provided, however, that any Indemnified Party is hereby authorized during the Notice Period to file any motion, answer or other pleading that shall be necessary or appropriate to protect its interest or those of the Indemnifying Party.  In the event that the Indemnifying Party notifies the Indemnified Party within the

Notice Period that it desires to defend the Indemnified Party against the Claims identified in the Claims Notice, the Indemnifying Party shall have the right and obligation, at its sole cost and expense, to defend with counsel of its own choosing by all appropriate proceedings, which proceedings shall be properly and diligently settled or prosecuted to a final non-appealable order of a court of competent jurisdiction; provided however, that (a) the Indemnified Party shall at all times have the right, at its sole option and expense, to employ separate counsel and to participate fully in the defense, compromise or settlement thereof, and (b) if the Indemnifying Party does not proceed diligently to defend the Claim within thirty (30) days after personal delivery or receipt of a Claim Notice, the Indemnified Party shall have the right, but not the obligation, to undertake the defense of any such Claim, and the Indemnifying Party shall be bound by any defense or settlement that the Indemnified Party may make as to such Claim.  Upon its assumption of the defense of any such Claim, the Indemnifying Party shall have full control of such defense and proceedings including any compromise or settlement thereof.  It there is more than one (1) Indemnifying Party then all Indemnifying Parties must coordinate the defense of the Indemnified Party against any Claims so as not aversely to affect the Indemnified Party's right to a proper defense.

(c)  Cooperation.  The parties agree reasonably to cooperate with one another and their respective counsel in contesting and defending any Claim by a Third Party (including granting reasonable access to the pertinent books, records, and personnel (to the extent such personnel are available) in their possession or control), or, if appropriate and related to the Claim in question, in making (i) any counterclaim against the Third Party asserting the Claims or (ii) any cross complaint against any Person.

(d)  Notwithstanding anything in this Section to the contrary, the Indemnifying Party shall not, without the written consent of the Indemnified  Party (i) settle or compromise and Claim or consent to the entry of any judgment with respect to such Claim that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to the Indemnified Party of a written release from all liability in respect to such Claim, (ii) settle or compromise any Claim in any manner that may materially and adversely affect the Indemnified Party, or (iii) settle or compromise any Claim in a manner that will require the Indemnified Party to pay any money.

(e) <u>Rights of Indemnified Party to Defend</u>. If the Indemnifying Party fails to notify the Indemnified Party within the Notice Period that the Indemnifying Party elects to defend the Indemnified Party pursuant to Section 11.3(b), or if the Indemnifying Party elects to defend the Indemnified Party pursuant to Section 11.3(b), but fails diligently and promptly to prosecute, defend or settle any Clam by a Third Party, then the Indemnified Party shall have the right to defend, or compromise and settle at the sole cost and expense of the Indemnifying Party, such Claim by a Third Party by all appropriate proceedings which proceeding may be prosecuted by the Indemnified Party to a final non-appealable order of a court of competent jurisdiction or settled without the consent of the Indemnifying Party, and the Indemnifying Party shall be bound by any defense or settlement that the Indemnified Party may make  as to such Claim.  The Indemnified Party shall have full control of such defense and proceeding.

(f) <u>Direct Claims.</u>  In the event any Indemnified Party should have a Claim against any Indemnifying Party hereunder that does not involve damages being asserted against or sought to be collected from it by a Third Party, the Indemnified Party shall send a Claim Notice containing the same type of information required by Section 11.3(a) with respect to such Claim to the Indemnifying Party.  If the Indemnifying Party does not notify the Indemnified Party within the Notice Period that it disputes such claim, the amount of such damages shall be conclusively deemed a liability of the Indemnifying Party hereunder.

[ECF No. 66-1 at 54-57].

The record shows that on May 13, 2009, R. M. Rose ("Rose"), writing on behalf of Dominion, advised Sellers' Representative, Tim Rogers ("Rogers"), that on April 29, 2009, Dominion met with auditors from the State of Texas, and learned that Dominion would be the subject of a Sales and Use Tax Audit covering tax periods extending from August 2005 through March 2009. [ECF No. 53-1 at 106]. "Since the audit will include periods preceding our ownership, [Dominion] is reviewing its options to maximize efficiency and effectiveness, including submitting to the State a request that the audit be bifurcated into two separate audit periods with the first including the prior ownership period and the second including the current

ownership period." [Id.] More importantly, Rose stated, "pursuant to Section 3.12 and Article XII of the [SPA]," the Sellers remained liable to indemnify Dominion for any additional taxes imposed as a result of the contemplated audit. The last sentence of the letter read: "This letter shall serve as a Claim Notice, pursuant to Section 11.3 of the [SPA] with respect to the above described tax audit. As of the date of this letter, [Dominion] cannot estimate the amount at issue." [Id.].

    One week later, Rogers, on behalf of Sellers, responded to Rose's letter as follows:

> Sellers are willing to assume the defense of any Claim arising from the above-described tax audit . . . to the extent that it relates to time periods prior to the closing under the [SPA]. [9] I have taken note of the comment in Mr. Rose's letter regarding the bifurcation of the audit into two time periods – before and after the closing. Until we have more detail, it is impossible to agree on how the tax audit will be handled; but I would request that no decisions be made regarding the handling of the audit without prior notice to me and written consent from the Sellers.

[ECF No. 66-2 at 42].

    At that time, Sellers took the position that at the audit's inception, "there was no 'Claim' since the state had not proposed any additional taxes." [ECF No. 53-1 at 108]. Dominion agrees. See [ECF No. 66-2 at 45; ECF No. 79 at 5]. It was not clear until the spring of 2010 as the end of the audit was approaching, that Texas planned to propose a "substantial amount of additional sales taxes for pre-closing time periods." Id. At that point, Sellers exercised their option to defend the Claim. In a letter to Rose, Rogers wrote:

> It is my view and the view of the other Sellers that the state is simply wrong about most all of the additional sales taxes they

---

[9] Sellers now argue that bifurcation of the audit was improper because "this shortening of the audit period resulted in the audit covering only pre-closing periods [meant that] Dominion had no dog in the fight and no incentive to aggressively defend the audit." [ECF No. 64 at 15].

plan to propose for the pre-closing time periods. In the past, [Dominion] has engaged KPMG[10] to defend it on similar issues with the state and KPMG has been highly successful in getting the state to drop most if not all of the additional taxes proposed.

As it now appears that the state is close to proposing additional sales taxes, it would be in everyone's interest for the Sellers to engage KPMG to deal with the state, and the Sellers plan to do so. KPMG has the experience and track record necessary to successfully represent all of the interests involved . . . . By engaging KPMG the Sellers would be formally assuming the defense of any Claim that may arise from the audit . . . .

[S]ellers are willing to pay KPMG's fees and expenses . . . .

As this process moves forward both KPMG and the Sellers must have the full cooperation of [Dominion]. Pursuant to the [SPA], the sellers/Sellers representative shall have access to records necessary to argue the position of the state. I was a bit taken aback at out meeting yesterday at the reluctance to provide records.

On August 23, 2010, a representative of KPMG emailed all parties, notifying them that the audit was complete, and that the state had agreed to reduce the taxes due by $811,782.33 rather than the $1,079.308.07 requested. [ECF No. 53.1 at 111]. This left $1,298,084.14 in additional taxes due for the pre-sale period. KPMG also stated that the party representing the state would be "leaving soon," and that it was "probably in everyone's best interest to come to a settlement with him since his successor is unknown." [Id.].

On September 3, 2010, Rogers wrote to those associated with Dominion, referencing the tax amount negotiated, and noting that interest had not yet been computed on the total. He mentioned that the state negotiator would be leaving his position, and stated: "It is the position of the Sellers under the [SPA] that [Dominion] should accept the settlement offer . . . . While the

---

[10] KPMG is a network of professional firms providing Audit, Advisory, and Tax services. <u>See</u> www. KPMG.com

Sellers do not agree with all of the tax items remaining in the settlement offer, the Sellers are also in agreement with KPMG's recommendation that this settlement offer is reasonable enough to not take on the risks and costs of potential litigation." [ECF No. 53-1 at 114]. Rogers then stated that the "Sellers [were] in agreement to accept the settlement offer . . . and further recommend[ed] that [Dominion do the same] in accordance with Section 11.3(d) of the [SPA]." [Id.] Rogers took the position that Sellers' acceptance of the settlement did not constitute an agreement that they were responsible to indemnify Dominion for the entire amount of the assessment. This reflected prior discussions in which Dominion represented that it would be responsible for increased taxes and interest associated with the McDonald's account. [Id.]

Sellers now take the position that Dominion is not entitled to indemnification for the additional state assessment because it breached the SPA in handling the sales and tax audit. According to Sellers, the following issues of material fact preclude summary judgment in favor of Dominion with respect to Sellers' responsibility for payment of state taxes: 1) Dominion did not properly manage the audit method or the selection of the sample base; 2) Rogers' recommendation that sales representatives visit customers to secure exemption certificates was rejected; 3) Dominion "put its own desire to save money ahead of efforts to reduce Sellers' liability for pre-closing tax liability"; 4) Dominion "put its desire to save money ahead of efforts to reduce Sellers' liability"; 5) Dominion refused to pursue the collection of back taxes; and 6) Dominion, through its representative[,] Mike Rose, directed KPMG's work to Sellers' exclusion. [ECF No. 64 at 2].

It is undisputed that Dominion's alleged breaches of the SPA occurred before there was a Claim, as that term is defined by the SPA, and before Sellers committed to defend against the Claim. In delineating Dominion's wrongdoings, Sellers do not cite a single provision of the SPA

applicable to unripe claims or to Sellers' right to participate in the process at that point. The Court agrees with Dominion that "[Sellers] were not actually excluded from the audit process at any time when they had a right to participate." [ECF No. 79 at 5]. Moreover, once the Claim ripened, Sellers committed to defend against that Claim, and hired a representative who negotiated a proposed settlement. Though they contend that KPMG's work was directed by Rose to the exclusion of the Sellers, it is impossible, on this record, to demonstrate that Sellers suffered any prejudice as a result. If the Sellers disagreed with what KPMG had done, they failed to say so. In fact, they accepted the settlement reached by KPMG, failed to challenge KPMG's characterization of the settlement as "reasonable," and recommended that Dominion, too, accept it. Again, the Court agrees with Dominion that Sellers "do not explain how they can legally assume the defense of a claim, recommend payment of the settlement their agent negotiates, and then take the position that they are not obligated to cover the claim." [Id. at 10].

Seller's now attempt to avoid the settlement by arguing that in agreeing to settle the Claim for the amount recommended by KPMG, they "expressly reserved their right to challenge Dominion's indemnity claim at a later date" [ECF No. 64 at 20]. This argument flatly misrepresents the record. Rogers, attempting to persuade Dominion to settle, wrote:

> [B]y recommending agreement to the . . . settlement offer, the Sellers are not admitting to or agreeing in any way that they are responsible to indemnify Dominion . . . for the full amount of the settlement offer . . . . Based on previous discussions with [Rose], the Sellers have understood that Dominion . . . would be responsible for the portion of the taxes attributable to the McDonald's account and the interest allocable to that amount. As for the balance of the settlement offer, there will need to be discussions between the parties as to the proper allocation of financial responsibility.

[ECF No. 53-1 at 114]. This language does not provide any ground upon which to argue that Sellers are not obligated to pay "the balance of the settlement." [Id.].

Sellers have failed to point to any issue of material fact sufficient to overcome Dominion's entitlement to Summary Judgment. Sellers are obligated to indemnify Dominion for its payment of $1,580,942.14 to the State of Texas representing tax that [Sellers] themselves failed to collect from their customers.

3. Sellers' Responsibility for Attorney's Fees

Both Sellers and Dominion have moved for Summary Judgment on this issue. Again, this issue must be resolved with reference to the SPA. According to Sellers, "[I]n an action for attorney's fees under an indemnification agreement, Delaware courts distinguish between fees incurred in actions against third parties and fees incurred in first-party actions against the indemnitor." See TranSched Sys. Ltd v. Versyss Transit Solutions, LLC, C.A. No. 07C-08-286 WCC, 2012 WL 1415466 at *2 (Del. Super. March 39, 1912) ("[T]he generally accepted rule require[es] that a contract provision . . . call for fee recovery expressly for establishing the right of indemnity in order to overcome the application of the American rule.") (footnote omitted)). Sellers argue that the SPA fails to satisfy this standard, relying on the following language from Section 11.2:

> From and after the Closing Date, the Sellers, jointly and severally, shall indemnify and hold harmless the Buyer, its Affiliates and its and their respective officers, directors, shareholders, employees, against successors and permitted assigns (the Buyer Indemnified Parties") from and against any Claim arising out of or resulting from:
>
>  . . . .
>
> (c) Any taxes payable by the Sellers hereunder;
>
> . . . . .
>
> In addition to the foregoing, the Seller shall reimburse the Buyer Indemnified Parties in connection with investigating

or defending any such claim that is the Claim of a third party as such expenses are incurred.

[ECF No 59-1 at 52]. Section 11.1 defines a "Claim as "any claims, loss, liability, cost, damage, or expense (including court costs and reasonable attorney's fees and expenses) that arises out of or results from the breach of, or the failure to perform under the agreement." [Id. at 51]. According to Sellers, Section 11.2 does not apply to fee recovery in first party actions, but, as Section 2.1 clearly demonstrates, is applicable only to fee recovery involving third party claims. [ECF No. 56 at 6].

Dominion counters that when Sections 11.2(a), which requires Sellers to indemnify and hold Dominion harmless "from and against any claim arising out of or resulting from: the Breach of, or failure to perform or satisfy any or the representations, warranties, and covenants made by the Sellers in this agreement," must be read in conjunction with Section 11.1's definition of "Claim." [ECF 66-1 at 54]. "When the definition of 'Claim' is substituted into the indemnity [provision] in Section 11.2, the SPA expressly requires the Defendants to indemnify and hold harmless Dominion from any liability, loss, damage, or expense, including court costs and reasonable attorney's fees and expenses incurred as a result of the Defendants' breach of the SPA." [ECF No. 74 at 4].

The language upon which Sellers rely appears at the very end of Section 11.2, and is prefaced by the phrase "*[i]n addition to the foregoing*," which is followed by language stating that "Seller shall reimburse the Buyer Indemnified Parties . . . in connection with investigating or defending . . . the Claim of a third party . . . ." [ECF No. 66-1 at 55]. Thus, the Court finds that Sellers are obligated under the terms of the SPA to indemnify Dominion for attorney's fees incurred as a result of Sellers' breach of the agreement, *and* must also indemnify Dominion

where a Claim is brought by a third party. The SPA posits an either/or situation, rather than limiting the issue of attorney's fees to only those situations implicating a third party.

The Plaintiff's Motion for Summary Judgment as to its right to attorney's fees should be granted in its entirety, and the Defendants' Motion opposing Dominion's entitlement to indemnification should be denied.

## III.  CONCLUSION

For the reasons set out above, the Court recommends that Plaintiff's Motion for Summary Judgment [ECF No. 51] be granted, and that the Motion for Summary Judgment filed by Sellers [ECF No. 56] be denied.  It is further recommended that Defendants' Motion to Strike Certain Testimony in the Affidavit of affiant, Winfield Ryan [ECF No. 86] be Denied.

In accordance with the Magistrate's Act, 28 U.S.C. § 636 (b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules for Magistrates, objections to this Report and Recommendation must be filed by February 19, 2011.  Failure to file timely objections will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n.7 (3d Cir. 2011).


Respectfully submitted,


s/ Cynthia Reed Eddy
Cynthia Reed Eddy
United States Magistrate Judge

Date:   January 30, 2013


cc:     All attorneys of record via CM-ECF